

**CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON
THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 13, 2024**

*Mark X. Mullin*

**United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| MISTY CHANEY BRADY, | § | CASE NO. 17-41120 (LEAD) |
| BP CHANEY, LLC, AND | § | CASE NO. 17-42793 |
| TEXAS RHH, LLC, | § | CASE NO. 17-43385 |
| | § | |
| | § | |
| DEBTORS. | § | CHAPTER 7 |
| | § | |
| JOHN DEE SPICER, CHAPTER 7 TRUSTEE, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | ADV. NO. 17-04136 |
| | § | |
| MAXUS HEALTHCARE PARTNERS, LLC AND | § | |
| STEVAN HAMMOND, | § | |
| | § | |
| DEFENDANTS. | § | |
| | § | |

### <u>MEMORANDUM OPINION</u>
*[Relates to Adv. ECF No. 280, 306]*

1

The Court conducted a fifteen day trial over a nine-month period on the Complaint[1] filed by John Dee Spicer (the "***Trustee***") in his capacity as the Chapter 7 trustee of the bankruptcy estates of Misty Chaney Brady ("***Ms. Brady***"); BP Chaney, LLC ("***BP Chaney***"); and Texas RHH, LLC ("***Texas RHH***") (together, the "***Debtors***") against Maxus Healthcare Partners, LLC ("***Maxus***") and Mr. Stevan Hammond ("***Mr. Hammond***") (together, the "***Defendants***").

By the Complaint, the Trustee seeks a judgment against the Defendants for (i) damages resulting from the Defendants alleged pre-petition tortious interference with the Debtors' contract with their attorneys; (ii) turnover of Debtors' business records consisting of 43 boxes of documents; (iii) damages resulting from Maxus alleged pre-petition breach of contract for failing to remit to Debtors (or the Trustee) the proceeds of their accounts receivable that had been collected by Maxus; and (iv) the Debtors' and Trustee's reasonable and necessary attorneys' fees and exemplary damages.

The Defendants contend that each of the Trustee's claims fail on the merits. Additionally, the Defendants assert ten separate affirmative defenses to the Trustee's various claims and causes of action.

The Court reviewed and carefully considered the pleadings and briefings filed in this Adversary Proceeding, the Joint Pre-Trial Order,[2] the testimony of witnesses, the exhibits admitted into evidence, the arguments of counsel, and the applicable statutory and case law. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law[3] as required

---

[1] *Chapter 7 Trustee's Second Amended Complaint* (the "***Complaint***"), Adv. ECF No. 280.
[2] *Joint Pre-Trial Order*, Adv. ECF No. 306. *See also Elvis Presley Enters. v. Capece, et al.*, 141 F.3d 188 (5th Cir. 1998) ("in is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial.").
[3] Any findings of fact that should be more appropriately characterized as a conclusion of law should be regarded as such, and *vice versa*.

2

by Federal Rule of Civil Procedure 52, made applicable in this Adversary Proceeding by Federal

Rule of Bankruptcy Procedure 7052.

## I.      JURISDICTION AND VENUE

The Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28

U.S.C. §§ 1334(b) and 157(a) and the standing order of reference in this district. This Adversary

Proceeding involves core and related to matters over which the Court has statutory authority to

enter final orders and judgments pursuant to 28 U.S.C. § 157(b)(2)(A), (C), (E), (K), and (O). Even

though the Court may not have constitutional authority to enter final judgments on certain of the

Trustee's causes of action, the Trustee and the Defendants have each consented to the Court's

issuance of final orders and a final judgment in this Adversary Proceeding. Venue for this

Adversary Proceeding is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## II.      BACKGROUND FACTS

The Debtors and Defendants have been in litigation for over a decade. This Adversary

Proceeding is the latest lawsuit between the parties in their long and bitter litigation history.[4]

Although the Court is not acting as an appellate court or relitigating the claims and disputes

between the parties that were resolved in a final amended judgment entered in the Texas State

Court Lawsuit,[5] a review of certain background facts previously litigated in the Texas State Court

---

[4] Additional background and history of the State Court Lawsuit (defined *infra* at § II.D) between the Debtors and the Defendants are detailed in the following published opinions: *Spicer v. Maxus Healthcare Partners, LLC*, 616 S.W.3d 59 (Tex. App.—Fort Worth 2020, no. pet.); *Furtek & Assocs., LLC v. Maxus Healthcare Partners, LLC*, No. 02-15-00309-CV, 2016 Tex. App. LEXUS 4192, 2016 WL 1600850 (Tex. App.—Fort Worth Apr. 21, 2016, no pet.).
[5] *See infra* at § II.D. Throughout the pendency of this Adversary Proceeding and during the trial, the Court instructed the parties, on multiple occasions, that the Court would not relitigate the claims and disputes resolved by a Texas state court in its amended final judgment in violation of the Rooker-Feldman doctrine. *See Rooker v. Fidelity Tr. Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

Lawsuit is necessary to frame the disputes and claims between the parties pending in this Adversary Proceeding.

## A.      Ms. Brady establishes Texas RHH—a home health agency

Ms. Brady established Texas RHH in 2006 as a home health agency providing certified and licensed home health services to patients in the State of Texas. When Texas RHH was first formed, the company had zero patients. By 2010, Texas RHH had grown to seven offices and approximately 800 patients. Approximately 92% of Texas RHH's patients were on Medicare while the remaining 8% of its patients paid for Texas RHH's services through either private health insurance or directly by the patient.

In late 2011 and early 2012, Ms. Brady decided to test the market for a possible sale of her Texas RHH business. On January 31, 2012, Ms. Brady engaged Furtek & Associates ("*Furtek*")— a company that assists businesses in the health care field with mergers, acquisitions, and restructuring.[6] The engagement letter between Texas RHH and Furtek provided, in part, that Furtek would assist Texas RHH with organizing its financial records for a potential sale of the business, establishing comprehensive on-line due diligence, and other support services needed in a sale process.

On August 6, 2012, Texas RHH expanded Furtek's engagement to include services to refine Texas RHH's Medicare and private insurance billing and collection process.[7] The documents associated with Texas RHH's billing and collection of its outstanding accounts receivable—from Medicare, private insurance companies, and directly from patients—is relevant in this Adversary Proceeding and more fully detailed *infra* at §§ II.D.3, III.B., and III.D.

---

[6] Maxus Ex. 4.
[7] Trustee Ex. 23.

## B.      Ms. Brady agrees to sell the Texas RHH business to Maxus

In early September 2012, Ms. Brady and Ms. Angie King ("***Ms. King***"), the then-President of Maxus, also a home health agency, met and began negotiations for Maxus to purchase the Texas RHH business. Negotiations progressed and on or about November 14, 2012, Texas RHH and Maxus executed a Letter of Intent[8] (the "***LOI***") wherein, subject to the terms and conditions detailed in the LOI, Maxus agreed to purchase the Texas RHH business.

Following the execution of the LOI, the negotiations between Texas RHH and Maxus continued to progress and ultimately culminated on December 31, 2012, when the parties executed and closed the *Asset Purchase Agreement* (the "***APA***" and "***APA Sale Transaction***").[9] The terms of the APA provided, in pertinent part:

- Maxus agreed to pay Texas RHH $8.8 million—$6 million at the closing of the APA and $2.8 million in a promissory note made payable to Texas RHH—for certain assets of Texas RHH.[10]

   - The $6 million paid by Maxus at closing of the APA is a critical component of Count One in this Adversary Proceeding and is addressed *infra* in §§ II.D.1, II.D.2, and III.C.

- Texas RHH retained its outstanding accounts receivable earned by Texas RHH on or before December 31, 2012.[11]

   - The outstanding accounts receivable retained by Texas RHH is a critical component of Counts Two and Three in this Adversary Proceeding and is addressed *infra* in §§ III.B, III.D, and III.E.

- Ms. Brady and Texas RHH retained ownership of certain books and records of Texas RHH.[12]

---

[8] Maxus Ex. 125; Trustee Ex. 53.
[9] Maxus Ex. 1; Trustee Ex. 105.
[10] Maxus Ex. 1 and Trustee Ex. 105 at § 1.2(b).
[11] Maxus Ex. 1 and Trustee Ex. 105 at §§ 1.1(d)(ii), (iii).
[12] Maxus Ex. 1 and Trustee Ex. 105 at §§ 1.1(d)(vi), (viii).

   &#9675; The retention of certain books and records by Texas RHH is a critical component of Count Two in this Adversary Proceeding and is addressed *infra* in §§ II.D.3, III.B.

## C. The Bourland, Wall & Wenzel law firm represented Ms. Brady and Texas RHH in the APA Sale Transaction

In or around October or November 2012, as the sale negotiations progressed between Texas RHH and Maxus, Ms. Brady and Texas RHH engaged the law firm of Bourland, Wall & Wenzel ("***BWW***")—and specifically attorney Mr. Bryon Hammer ("***Mr. Hammer***")—to represent Ms. Brady and Texas RHH in the sale transaction with Maxus.[13] Ms. Brady and Texas RHH had been clients of BWW—and specifically Mr. Hammer—on various unrelated matters dating back to 2009. Mr. Hammer testified credibly that he and BWW had "developed a close professional working relationship"[14] with Ms. Brady dating back to 2009 and that he personally observed that "Ms. Brady relied and trusted on [BWW]'s advice."[15]

On December 1, 2012, Ms. King, on behalf of Maxus, emailed an initial draft *Asset Purchase Agreement*[16] (the "***Initial Draft APA***") to Ms. Brady and Texas RHH. The credible evidence established that Ms. King, Ms. Victoria Jensen,[17] and Mr. Hammond[18] each had input in

---

[13] Adv. ECF No. 357, pg. 8, lines 19–24.

[14] Adv. ECF No. 357, pg. 7, lines 6–7.

[15] Adv. ECF No. 357, pg. 7, lines 10–13.

[16] Trustee Ex. 68; *see also* Adv. ECF No. 357, pg. 8, lines 1–9.

[17] Adv. ECF No. 356, pg. 15, lines 10–20 and pg. 19, lines 12–23. Ms. Victoria Jensen was the secretary for Maxus and Mr. Hammond's personal lawyer. *See* Ms. King testimony, Adv. ECF No. 356 at pg. 8, lines 9–21; Mr. Anderson's testimony, Adv. ECF No. 358 at pg. 11, line 24 through pg. 12, line 9.

[18] Throughout this Adversary Proceeding and during this trial, Mr. Hammond's testimony was evasive and mendacious. For example, Mr. Hammond testified in this Court that he was "minimally" and "not really involved" with the Maxus acquisition of Texas RHH (*see* Adv. ECF No. 349 at pg. 80, lines 9–11; and pg. 96, lines 11–15). But his testimony was credibly and overwhelmingly controverted by other witnesses and exhibits. *See generally* the testimony of Ms. King and Mr. Anderson, Trustee Exs. 84, 87, 88, 89, 91, 93, 94, 95, 97, 99, 101, 102, and 103. Additionally, Mr. Hammond's testimony in this Court was directly contrary to his prior testimony in the State Court Lawsuit (defined *infra* at § II.D) where he testified that he was very involved in Maxus' due diligence and acquisition of Texas RHH stating that when he reviewed the November 2012 financials provided by Texas RHH "[i]t was really amazing[] because it seemed like each month things got better and better and the liabilities keep getting smaller and smaller" and that Texas RHH growth seemed "explosive" and that "the current ratio [of assets to

drafting the Initial Draft APA. They used a form asset purchase agreement previously prepared for

Maxus by the Polsinelli law firm[19] in a prior transaction. Neither Ms. Brady, Mr. Hammer, nor

anyone at BWW participated in drafting the Initial Draft APA circulated by Ms. King on December

1, 2012.

On December 3, 2012, Ms. Brady replied to Ms. King's December 1, 2012, email that

attached the Initial Draft APA stating, in part:

> I just wanted to touch base and let you know *my attorney* is reviewing the
> contract, and I have a meeting scheduled to go over everything with him
> Wednesday morning. So it will probably be then before I can get back with you.
> Let me know if you make any changes in the meantime.[20]

On December 5, 2012, Ms. Brady sent a follow-up email to Ms. King stating:

> I met with *my attorney* this morning to go over the purchase agreement. He
> estimates that it is going to take him approximately another 15 hours to redraft
> the agreement and incorporate the changes that are necessary to move forward.
> It seems like the agreement might have originally been used for another
> purchase from a corporation and it does not correlate with the LOI and there are
> a number of additional concepts that were not included in the LOI. Before I
> have him spend the time redrafting the areas he feels are necessary I would like
> to come to an agreement on the following outstanding key points of our
> transaction: . . ."[21]

On December 8, 2012, Ms. King sent a reply email to Ms. Brady stating, "I just want to

remind you to send me the contract notes from *your lawyer*."[22]

---

liabilities] was getting really extraordinarily better with every financial statement [Maxus] got." *See Spicer*, 616
S.W.3d at 81.
[19] Adv. ECF No. 356, pg. 10, lines 11–16 and pg. 15, lines 3–10.
[20] Trustee Ex. 69 (emphasis added).
[21] Trustee Ex. 73 (emphasis added).
[22] Trustee Ex. 75 (emphasis added).

On December 18, 2012, Ms. King sent an email to Ms. Brady attaching proposed closing documents and stating "[a]ttached are the closing documents we received from *our lawyer*. They are pretty simplistic, but wanted to send them to you."[23]

On December 19, 2012, Ms. Brady sent a reply email to Ms. King stating, in part, "I went over the redline agreement with *my attorney* and have highlighted the areas [on the attached memorandum] that they feel need to be addressed."[24]

On December 21, 2012, Ms. Brady sent an email confirming a December 26, 2012, meeting between the parties, which stated:

> *My attorney* confirmed 1:00 on Wednesday. The name of the law firm is Bourland, Wall & Wenzel, P.C. and their address is 301 Commerce Street, suite 1500, Fort Worth, Texas 76102.[25]

Later that same day, Ms. Brady sent another email to Ms. King stating, in part, "*[m]y attorney* said they will have the agreement including a redlined version to you on or before Monday morning."[26]

Finally, on December 31, 2012, Mr. Hammer sent a response email to Ms. King (and others copied on the email) responding to a question from Ms. King stating, in part, "I cannot answer that for you because I cannot tell you what a Court will do and *I am only representing the seller*."[27]

Although Mr. Hammond and Maxus contend that BWW was also representing Maxus in the APA sale transaction, the clear and convincing evidence—including the credible testimony of Mr. Hammer, Ms. Brady, Ms. King, and Mr. Steven Anderson[28] and uncontroverted corroborating

---

[23] Trustee Ex. 81 (emphasis added).
[24] Trustee Ex. 82 (emphasis added).
[25] Trustee Ex. 85 (emphasis added).
[26] Trustee Ex. 86 (emphasis added).
[27] Trustee Ex. 100 (emphasis added). Maxus points to Maxus Ex. 128 as evidence that BWW was acting as counsel to both Texas RHH and Maxus. The Court disagrees.
[28] Mr. Steven Anderson is a former employee of Maxus. *See generally*, ECF No. 358.

exhibits admitted into evidence—unequivocally established that BWW was representing only Ms. Brady and Texas RHH in the APA Sale Transaction with Maxus. There is not one shred of credible evidence to remotely suggest that BWW or Mr. Hammer was also representing Maxus or Mr. Hammond in the APA Sale Transaction. Mr. Hammond's testimony to the contrary was void of any credibility.

**D.     The Texas State Court Lawsuit**

During the eighteen months or so after December 31, 2012—the closing of the APA Sale Transaction between Texas RHH and Maxus—disputes arose between the parties. Ultimately, the parties ended up in litigation, and the parties have been in litigation ever since.

On October 24, 2014, Maxus filed suit against Ms. Brady and Texas RHH in the 17th Judicial District Court - Tarrant County, Texas; Cause No. 017-275219-14 (the "***Texas State Court***" and the "***State Court Lawsuit***").[29] A jury trial in the State Court Lawsuit began on January 11, 2017, and continued for six weeks. The jury ultimately returned a verdict for Maxus against Ms. Brady and Texas RHH on several claims.[30] On September 19, 2017, consistent with the jury findings, the Texas State Court entered its *Final Judgment*.[31] Ms. Brady and Texas RHH filed numerous post-trial motions[32] and appeals of the Final Judgment. Ultimately, on September 17, 2021, the State Court entered its *Amended Final Judgment*,[33] which is now a final judgment.

---

[29] Trustee Ex. 139; Maxus Ex. 131. Maxus subsequently added Debtor BP Chaney and several other defendants in the State Court Lawsuit, but the claims against those subsequently added parties were dismissed and were not tried before the jury.
[30] Maxus Ex. 43.
[31] Maxus Ex. 47.
[32] Maxus Exs. 45 and 50.
[33] Maxus Ex. 61.

The following issues and disputes raised in the State Court Lawsuit are relevant to the disputes and issues in this Adversary Proceeding.[34]

### 1. *Ms. Brady and Texas RHH failed to disclose IRS tax claims and liens to Maxus prior to closing the APA sale transaction*

The State Court Lawsuit litigated several disputes between the parties during the proposed sale negotiations through the closing of the APA Sale Transaction.[35] Specifically relevant to the Adversary Proceeding, on or about November 20, 2012, as negotiations were progressing between Texas RHH and Maxus, the Internal Revenue Service ("***IRS***") sent Texas RHH a *Notice of Federal Tax Lien*[36] (the "***IRS Notice***"). The IRS Notice stated that a lien had been placed on Texas RHH's property due to its failure to remit payroll taxes to the IRS between 2006 through 2011. The unremitted payroll taxes exceeded $2.7 million. Neither Ms. Brady nor Texas RHH disclosed the IRS Notice or the existence of the IRS tax claim and lien to Maxus. Mr. Hammer—counsel to Ms. Brady and Texas RHH—testified that he first learned that Texas RHH had unpaid taxes owing to the IRS in late November 2012.[37]

In the late morning or early afternoon of December 31, 2012, but prior to closing, Maxus wired $5.7 million to Texas RHH (the net amount owing for its $6 million payment due at closing). Shortly thereafter, and again prior to closing, Ms. Brady went to the bank and obtained a $3,091,445.19 certified check made payable to the IRS using some of the funds wired into the

---

[34] Again, to be clear, as instructed by the Rooker-Feldman doctrine, the Court is not exercising jurisdiction or relitigating the claims and disputes resolved in the Amended Final Judgment entered in the State Court Lawsuit. *See Rooker v. Fidelity Tr. Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).
[35] Adv. ECF No. 306, pg. 2 ¶ 2. *See also* Maxus Ex. 61.
[36] Maxus Ex. 127.
[37] Maxus Ex. 161, pg. 51, lines 3–9.

account by Maxus.[38] Ms. Brady then hand-delivered the certified check to the IRS to pay the IRS

claim and upon paying the claim in full, she received a release of lien certificate from the IRS.[39]

Ms. Brady then went to BWW's office and executed the APA just prior to the subsequent

closing. At or about that same time, Ms. Brady informed her attorney—Mr. Hammer—that she

had used a portion of the Maxus $6 million payment to pay the IRS claim.[40] At no time, however,

did Mr. Hammer inform Maxus or Mr. Hammond about (i) the existence of the IRS claim and lien

against Texas RHH, or (ii) that Ms. Brady used a portion of the Maxus $6 million payment prior

to closing the APA to pay off the IRS claim and lien.[41] Ultimately, the jury in the State Court

Lawsuit found, in part, that Ms. Brady committed fraud against Maxus.[42]

Ms. Brady's and Texas RHH's above actions are not specifically relevant to the live

disputes in this Adversary Proceeding. But the extent to which BWW or Mr. Hammer may have

had notice or knowledge of Ms. Brady's and Texas RHH's above actions is relevant to the

Trustee's claims against Maxus and Mr. Hammond for alleged tortious interference with the

Debtors' contract with BWW, as more fully addressed *infra* at §§ II.D.2 and III.C.

### 2. *BWW withdrew from representing Ms. Brady and Texas RHH as lead litigation counsel in the State Court Lawsuit*

After Maxus commenced the State Court Lawsuit, Ms. Brady and Texas RHH again

retained BWW and Mr. Hammer—this time as their lead litigation counsel in the State Court

Lawsuit. During that litigation, Ms. Brady and Texas RHH identified Mr. Hammer as a person

---

[38] Adv. ECF No. 353, pg. 194, lines 2–24.
[39] Adv. ECF No. 352, pg. 153, line 24 through pg. 154, line 6; *see also* Adv. ECF No. 353, pg. 194, lines 3–14.
[40] Trustee Ex. 161 at pg. 42, line 22 through pg. 43, line 22.
[41] Adv. ECF No. 357 at pg. 42, lines 18–22; pg. 111, line 19 through pg. 112, line 15. *See also* Maxus Ex. 161 at pg. 44, line 9 through pg. 45, line 25. *See also Spicer*, 616 S.W.3d at 82.
[42] Maxus Ex. 43 at pgs. 29–31; Maxus Ex. 47 at pg. 3 ¶ 6. In her testimony in this Adversary Proceeding, Ms. Brady attempted to explain away and justify her (i) failure to disclose the IRS claims and liens to Maxus, and (ii) her unauthorized use of the Maxus $6 million to pay off the IRS claims and liens. The Court finds that Ms. Brady's testimony in this Adversary Proceeding on these issues was not credible.

with knowledge of relevant facts in the State Court Lawsuit. Accordingly, Maxus served Mr. Hammer with a notice of deposition.[43] On September 17, 2015, Maxus then took the deposition of Mr. Hammer.[44] During the deposition, counsel for Maxus asked Mr. Hammer questions that caused BWW to believe Maxus might assert claims against the firm or one or more if its members. Consequently, BWW made the decision during the deposition to terminate the deposition[45] and to withdraw from representing Texas RHH and Ms. Brady in the State Court Lawsuit.[46]

When BWW withdrew as counsel to Ms. Brady and Texas RHH, they had paid BWW approximately $400,000.00 in attorneys' fees.[47] Ms. Brady and Texas RHH then had to incur additional fees to enable their new lead counsel in the State Court Lawsuit—Hanshaw Kennedy Hafen, LLP ("**Hanshaw Kennedy**")—to be brought up to speed in the litigation.

A couple of months later, on November 18, 2015, Maxus filed suit against BWW claiming BWW (i) represented Ms. Brady, Texas RHH, and Maxus in the APA negotiations and committed legal malpractice and professional negligence against Maxus; (ii) breached its fiduciary duty to Maxus; and, in the alternative, (iii) committed fraud against Maxus.[48] Almost two years after having initiated its lawsuit against BWW, Maxus filed a notice of non-suit voluntarily dismissing its lawsuit against BWW.[49]

Mr. Hammond and Maxus contend that BWW and Mr. Hammer represented not only Ms. Brady and Texas RHH in the APA Sale Transaction, but they also represented Maxus in the APA Sale Transaction. As detailed more fully *infra* at § III.C, the clear and convincing evidence in this

---

[43] Trustee Ex. 157.
[44] Trustee Ex. 161.
[45] Trustee Ex. 161, pg. 66, line 5 through pg. 67, line 4.
[46] Trustee Ex. 162.
[47] Adv. ECF No. 353, pg. 53, lines 1–4.
[48] Trustee Ex. 169.
[49] Trustee Ex. 193.

Adversary Proceeding—including the credible testimony of Mr. Hammer, Ms. Brady, and Ms. King along with the corroborating exhibits admitted into evidence—unequivocally established that BWW did not and was not representing Maxus in the APA Sale Transaction. There is no credible evidence to remotely suggest that BWW or Mr. Hammer represented Maxus or Mr. Hammond in the APA Sale Transaction. As noted earlier, Mr. Hammond's testimony to the contrary lacked any credibility.

Additional discussion and analysis related to this issue is more fully detailed and addressed *infra* at § III.C.

### 3. *The 43 boxes of documents*

In October of 2014, just prior to Maxus filing of the State Court Lawsuit, Ms. Brady and Texas RHH become aware that Maxus had taken possession and moved approximately 200 boxes of documents (together, the "***200 Boxes***") from Texas RHH's property without the knowledge, consent, or authorization of Ms. Brady or Texas RHH. Maxus—at the direction of Mr. Hammond—moved the 200 Boxes to a warehouse in Dallas owned by one of Mr. Hammond's other companies, Allied Marketing Group. Maxus and Mr. Hammond contend, however, that Maxus owned the 200 Boxes, and they did not require the approval from Ms. Brady or Texas RHH to move the 200 Boxes.

During the State Court Lawsuit, Ms. Brady and RHH filed a motion to compel Maxus to return the 200 Boxes to Texas RHH, or, at a minimum, produce the 200 Boxes in discovery. Although Maxus agreed to return and/or produce the 200 Boxes, Maxus failed to produce or return 43 of the 200 Boxes of documents (the "***43 Boxes of Documents***"). From October 2014 through February 2015, Ms. Brady and Texas RHH served Maxus with multiple requests for production of documents in the State Court Lawsuit seeking, in part, the return or production of the 43 Boxes of

13

Documents. Maxus and Mr. Hammond contend that they represented to the State Court that, to the extent the 43 Boxes of Documents existed, such documents (i) were owned by Maxus, and (ii) had been made available to Ms. Brady and Texas RHH in discovery. The credible evidence in this Adversary Proceeding, however, strongly suggests that during the State Court Lawsuit neither Maxus nor Mr. Hammond ever produced or made the 43 Boxes of Documents available to Ms. Brady and Texas RHH.

Regardless of whether Maxus or Mr. Hammond produced or made available for inspection the 43 Boxes of Documents in the State Court Lawsuit, the ownership and turnover of the 43 Boxes of Documents was, in fact, the *subject* of Count II in the Complaint in this Adversary Proceeding. Additionally, the 43 Boxes of Documents were the subject of several motions, pleadings, and hearings in this Adversary Proceeding,[50] which ultimately culminated in the Court's *Order Issuing Sanctions for Spoliation by Defendants*[51] and *Order Clarifying Order Issuing Sanctions for Spoliation by Defendants*[52] (together, the "**Sanction Orders**") issued against Mr. Hammond and Maxus.

As more fully detailed in the Sanction Orders, Mr. Hammond and Maxus (i) denied that the 43 Boxes of Documents existed—but they did exist; (ii) willfully, maliciously, and in bad faith caused the 43 Boxes of Documents to be destroyed in May 2019—over 20 months *after* this Adversary Proceeding had been commenced; (iii) attempted to cover-up their intentional and bad faith destruction of the 43 Boxes of Documents; and (iv) then attempted to mislead the Debtors,

---

[50] The production of the 43 Boxes of Documents were also the subject of discovery disputes in the Debtors' underlying bankruptcy cases.
[51] Adv. ECF No. 217.
[52] Adv. ECF No. 244.

the Trustee, and the Court that the destroyed 43 Boxes of Documents had been "digitized" and

preserved, when in fact they had not been "digitized" or preserved in any way.

The Court's findings of fact and conclusions of law in the Sanction Orders (including the

Court's oral findings of fact and conclusions of law detailed in Exhibit "A" to the initial Sanction

Order) are incorporated herein by reference, as if fully set forth herein, as additional findings of

fact and conclusions of law in support of this Memorandum Opinion.

The impact of the Sanction Orders on the claims and causes of action in this Adversary

Proceeding are addressed more fully *infra* at § III.B.

### 4. *Ms. Brady and Texas RHH filed counterclaims against Maxus in the State Court Lawsuit*

Ms. Brady and Texas RHH filed counterclaims against Maxus in the State Court Lawsuit.

Their counterclaims included (i) a conversion claim against Maxus contending that Maxus had

stolen or converted the 200 Boxes (which included the 43 Boxes of Documents), and (ii) a breach

of contract claim against Maxus due to its alleged failure to turnover to Ms. Brady and Texas RHH

all the proceeds of their accounts receivable which were collected by Maxus post-closing of the

APA. Ms. Brady and Texas RHH, however, elected not to submit either claim to the jury.[53]

### 5. *The State Court Amended Final Judgment*

The trial in the State Court Lawsuit commenced on January 11, 2017, and continued

thereafter for six weeks. After the close of evidence in the State Court Lawsuit, the jury returned

a verdict finding, in part, that (i) Texas RHH breached the APA, and (ii) Ms. Brady and Texas

---

[53] Because Texas RHH had initially asserted the conversion and breach of contract claims against Maxus in the State Court Lawsuit, the Defendants contend that both claims fail in this Adversary Proceeding and should be dismissed based on res judicata. These issues are more fully addressed *infra* at §§ III.C. and D.

RHH had committed fraud against Maxus.[54] The jury awarded Maxus $2.3 million in connection with these claims, which was upheld, in part, in the Amended Final Judgment.

### III.   ANALYSIS OF CLAIMS IN THIS ADVERSARY PROCEEDING

**A.   The Trustee's Complaint**

The Trustee's Complaint, as filed, asserts the following claims and causes of action against the Defendants:

- ***Count One—Tortious Interference with Contract*** (asserting that the Defendants intentionally interfered with Debtors' contract with their attorneys—BWW);[55]

- ***Count Two—Turnover of Debtors' Records*** (seeking turnover of the 43 Boxes of Documents that the Defendants intentionally destroyed during the pendency of this Adversary Proceeding resulting in the Sanction Orders);[56]

- ***Count Three—Breach of Contract for failing to Remit or Turnover Accounts Receivable Proceeds*** (asserting that Maxus failed to remit to Texas RHH—and now the Trustee—proceeds of its accounts receivable that were paid to or collected by Maxus for the benefit of Texas RHH);[57] and

- ***Count Four—Attorneys' Fees and Exemplary Damages*** (for having to file the Complaint based on the Defendants' alleged conduct).[58]

Defendants deny each of the Trustee's claims on the merits and assert the following affirmative defenses:

- *Privilege/Justification*—Trustee's tortious interference claim against the Defendants is barred by the doctrine of privilege.[59]

- *Res Judicata*—Trustee's claims against the Defendants for turnover of the 43 Boxes of Documents and breach of contract for failing to remit accounts receivable proceeds to Texas RHH are barred by res judicata.[60]

---

[54] Maxus Ex. 43.
[55] Adv. ECF No. 280, pgs. 7–8.
[56] Adv. ECF No. 280, pgs. 8–9.
[57] Adv. ECF No. 280, pgs. 8–9.
[58] Adv. ECF No. 306, pg. 10.
[59] Adv. ECF No. 306, pgs. 17–18.
[60] Adv. ECF No. 306, pgs. 18–20.

- *Capacity*—Trustee's claims against Mr. Hammond for tortious interference and breach of contract for failing to remit accounts receivable proceeds to Texas RHH fail because he cannot be held liable in the capacity in which he has been sued.[61]

- *Payment*—Trustee's claims against the Defendants are barred, in part, based upon the affirmative defense of payments Maxus made to Texas RHH after the APA closed.[62]

- *Offset*—To the extent Maxus is liable for any amounts of damages to Texas RHH, such amount should be offset by the judgment and claim that Maxus has against Texas RHH.[63]

- *Prior Material Breach/Fraud*—Trustee's claims against Defendants for breach of contract of the APA are subject to the doctrine of prior material breach and fraud affirmative defenses.[64]

- *Estoppel*—Trustee's claims against Defendants for breach of contract for failing to remit accounts receivable proceeds to Texas RHH are barred by Defendants' estoppel affirmative defenses (estoppel, quasi-estoppel and judicial estoppel).[65]

- *Prompt Pay Laws/Contracts with Private Insurers*—Trustee's claims against Defendants for breach of contract for failing to remit accounts receivable proceeds to Texas RHH are barred by Defendants' affirmative defense that Texas RHH failed to bill the disputed accounts receivable by the requisite deadline for such accounts receivable.[66]

- *Doctrine of Illegality*— Trustee's claims against Defendants for breach of contract for failing to remit accounts receivable proceeds to Texas RHH are barred by Defendants' affirmative defense that Texas RHH failed to comply with applicable legal requirements including applicable Medicare regulations 42 C.F.R. § 424.44.[67]

- *Statute of Limitations/Laches*—Trustee's claims against the Defendants fail because the Trustee did not pursue such claims within (i) the statutorily-required time period(s); (ii) the period of time in which applicable contracts required claims to be submitted; and (iii) the statute of limitations for pursuing claims against payors.[68]

---

[61] Adv. ECF No. 306, pg. 20.
[62] Adv. ECF No. 306, pg. 20.
[63] Adv. ECF No. 306, pgs. 20–21.
[64] Adv. ECF No. 306, pg. 21.
[65] Adv. ECF No. 306, pgs. 21–22.
[66] Adv. ECF No. 306, pg. 22.
[67] Adv. ECF No. 306, pg. 22.
[68] Adv. ECF No. 306, pg. 22.

**B.**    **The Impact of the Sanction Orders on the Trustee's Claims and Causes of Action**

As more fully described in the Sanction Orders, Mr. Hammond and Maxus willfully, maliciously, and in bad faith destroyed the 43 Boxes of Documents—which were the subject of the Trustee's Count Two turnover claim. The Defendants then attempted to cover-up their actions by contending that the contents of the destroyed 43 Boxes and Documents had been "digitized" and somehow preserved when, in fact, the contents of the 43 Boxes of Documents had been destroyed and not preserved in any way.

Based on the Defendants' intentional and bad faith destruction and spoliation of the 43 Boxes of Documents, the Debtors and the Trustee sought (i) terminating sanctions striking the Defendants' responsive pleadings to the Compliant, and (ii) reimbursement of the Debtors' and Trustee's costs and attorneys' fees that have been incurred relating to the Defendant's willful, malicious, and bad faith actions. For the reasons more fully set forth in the Sanction Orders, the Court declined to issue terminating sanctions against the Defendants but granted the Debtors' and Trustee's request for reimbursement of their attorneys' fees.[69] Further, the Court imposed the following additional sanctions against the Defendants regarding the Complaint on a Count-by-Count basis, as modified by the Pre-Trial Order:

- ***Count One—Tortious Interference with Contract*** (asserting that the Defendants intentionally interfered with Debtors' contract with their attorneys—BWW):

    ⇒ No sanctions imposed, Count One to proceed as plead.

---

[69] The Sanction Orders award the Debtors and the Trustee reimbursement of their reasonable attorneys' fees and costs from the Defendants, jointly and severally, from and after August 21, 2017, for having to file many motions and participate in multiple hearings in this Adversary Proceeding and the Debtors' underlying bankruptcy cases seeking access to or the turnover of the 43 Boxes of Documents. All such costs and fees were incurred as a direct result of the Defendants' willful and intentional failure to initially produce the 43 Boxes of Documents (when they existed) and for their willful, malicious, and bad faith spoliation and destruction of the 43 Boxes of Documents during this Adversary Proceeding. A hearing to determine the total amount of reasonable attorneys' fees and costs to be awarded to the Debtors and the Trustee will be set by further Order of the Court.

- ***Count Two—Turnover of Debtors' Records/Value of Accounts Receivable***
  (originally seeking turnover of the 43 Boxes of Documents that the Defendants
  willfully and maliciously destroyed during the pendency of this Adversary
  Proceeding). Because turnover of the actual 43 Boxes of Documents is now
  impossible, the following sanctions have been imposed:

  ⇒ The first "value" component of the destroyed 43 Boxes of Documents
     to the Texas RHH bankruptcy estate was, in part, to enable the Trustee
     to prove-up *and collect* the outstanding accounts receivable that may
     still be owing to the Texas RHH bankruptcy estate from third party
     obligors, such as Medicare, private insurance, or other third parties.
     Consequently, the Court issued the following adverse inference sanction
     against the Defendants: rather than the Trustee having to prove-up the
     value and collectability of Texas RHH's outstanding accounts
     receivable in the amount of $2,888,212.90,[70] the burden of proof was
     shifted to the Defendants to establish, by a preponderance of the
     evidence, that the actual *collectible* value of the Texas RHH accounts
     receivable is less than the $2,888,212.90 asserted by the Trustee.[71]

  ⇒ The second "value" component of the destroyed 43 Boxes of
     Documents asserted by the Debtors and the Trustee is the substantial
     detrimental effect the spoliation of the documents may have on their
     ability to prosecute pending objections to the proofs of claim and other
     pleadings, motions or objections filed by Maxus in each of the Debtors'
     main bankruptcy cases and other pending adversary proceedings.[72] This
     "value" component attributable to the Defendants' destruction of the 43
     Boxes of Documents is beyond the scope of claims in this Adversary
     Proceeding. This Memorandum Opinion, therefore, is without prejudice
     to the Debtors and the Trustee requesting additional sanctions against
     Maxus in those unrelated pending matters in response to the
     Defendants' willful and malicious spoliation of the 43 Boxes of
     Documents.

- ***Count Three—Turnover of Accounts Receivable Proceeds*** (asserting that the
  Maxus failed to remit to Texas RHH—and now the Trustee—the proceeds of its
  accounts receivable that was paid to or collected by Maxus for the benefit of Texas
  RHH):

---

[70] Adv. ECF No. 306, pg. 5 ¶ 12.

[71] The Court also ordered, as a component of the sanction, that the Defendants could not assert a statute of
limitations defense to the collectability of the Accounts Receivable. *See* Sanction Orders, Adv. ECF Nos. 217 and
244.

[72] Adv. ECF No. 306, pg. 8 ¶ 29. For example, Maxus has filed proofs of claim in each of the Debtors' bankruptcy
cases as well as a pending complaint in a separate adversary proceeding against Ms. Brady.

⇒ The sanction imposed in the Sanction Orders and Pre-trial Order potentially modified Count Three because of the potential the Defendants would be obligated to pay the Trustee the value of *collectible* accounts receivable, which could include proceeds of accounts receivable that Maxus may have collected but not remitted to the Debtors or Trustee. But to the extent the Defendants establish the accounts receivable has little, or no value as asserted by the Trustee, the Trustee retains the burden to establish that Maxus had collected specific proceeds of its accounts receivable but failed to remit such proceeds to Texas RHH.

- ***Count Four—Attorneys' Fees and Exemplary Damages*** (for having to file the Complaint based on the Defendants' alleged conduct):

⇒ No sanctions imposed, Count Four will proceed as plead.

The Court will next address, in turn, the Trustee's live claims against the Defendants, as modified above by the Sanction Orders and Joint Pre-Trial Order.

## C. Count One—Tortious Interference with Contract

The Trustee contends that the Defendants intentionally interfered with Debtors' contract with BWW—their lead attorneys in the State Court Lawsuit.[73] The Trustee contends further that "Maxus and [Mr.] Hammond developed a plan to allege claims against BWW so Maxus and [Mr.] Hammond could disqualify BWW and pursue BWW's insurance policy."[74] According to the Trustee, Mr. Hammond's motive was threefold: (i) to harm the Debtors in the State Court Lawsuit by causing them to retain new lead litigation counsel; (ii) to further deplete Ms. Brady's financial resources; and (iii) to find another source of funds to pursue—BWW's insurance policy.

The tort of interference with a contract allows for a plaintiff to recover against a defendant who intentionally interferes with the performance of the contract between the plaintiff and its counterparty by inducing or otherwise causing the counterparty not to perform the contract.[75] In

---

[73] Adv. ECF No. 306, pgs. 2–3 ¶¶ 2–7.
[74] Adv. ECF No. 306, pg. 3 ¶ 5.
[75] Restatement (Second) of Torts § 766.

Texas, a successful tortious interference claim requires the plaintiff to establish each of the following four elements: (1) a valid contract existed; (2) the defendant willfully and intentionally interfered with the contract; (3) the interference proximately caused the plaintiff harm; and (4) the plaintiff suffered actual damages.[76]

### 1.    *A Valid Contract Existed*

The first element for a tortious interference claim requires that a valid contract exists.[77] The parties stipulated in the Joint Pre-Trial Order that "Texas RHH, Brady, and BP Chaney hired the Fort Worth, Texas law firm of [BWW] to represent them in the State Court Lawsuit."[78] Therefore, the Court finds that the first element is satisfied.

### 2.    *Willful and Intentional Interference with the BWW Contract*

The second element for a tortious interference claim requires that the plaintiff establish that the defendant willfully and intentionally interfered with the contract.[79] The Trustee contends that the following evidence demonstrates that the Defendants' willfully and intentionally developed a plan to interfere with the Debtors' contract with BWW:

- The September 17, 2015, deposition of Mr. Hammer;[80]

- The *Motion for Withdrawal of Counsel*[81] filed by BWW in the State Court Litigation;

- The Kelly Hart & Hallman LLP invoices;[82]

- The *Plaintiff's Original Petition*[83] filed by Maxus against BWW; and

---

[76] *Settlement Cap. Corp. v. BHG Structured Settlements, Inc.*, 319 F.Supp.2d 729, 733 (N.D. Tex. 2004) (citing *Prudential Ins. Co. of Am. v. Fin. Rev. Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000)).
[77] *Settlement Cap. Corp.*, 319 F.Supp.2d at 733.
[78] Joint Pre-Trial Order, Adv. ECF No. 306, pg. 24 ¶ 13.
[79] *Settlement Cap. Corp.*, 319 F.Supp.2d at 733.
[80] Trustee Ex. 161.
[81] Trustee Ex. 162; Adv. ECF No. 401 at pg. 17.
[82] Trustee Ex. 184; ECF No. 393 at pgs. 40–59.
[83] Trustee Ex. 169.

- The testimony of Ms. King.[84]

To analyze the Trustee's contentions in support of this element, the Court will address each of the Trustee's contentions, in turn.

### a. The September 17, 2015, deposition of Mr. Hammer

Mr. Hammer was the attorney with BWW who represented Texas RHH and Ms. Brady in the APA sale transaction. Ms. Brady and Texas RHH identified Mr. Hammer as a person with knowledge of relevant facts in the State Court Lawsuit. Accordingly, it was reasonable for the Defendants to depose Mr. Hammer in the State Court Lawsuit to determine what non-privileged facts and information he knew that may be relevant in the State Court Lawsuit.

Early in the deposition, Maxus' counsel asked Mr. Hammer if he or BWW had ever been sued for fraud, misrepresentation, negligence, breach of contract, breach of fiduciary duty, or malpractice.[85] A short time later in the deposition, Maxus' counsel asked Mr. Hammer if BWW had malpractice insurance should it be needed to "cover any claims that potentially arise out of the Maxus transaction[.]"[86] After the short discussion on insurance coverage, the questions in the deposition again focused on other issues not relevant here.

Then near the end of the deposition, Maxus' attorney focused his questions specifically on the IRS claim and lien against Texas RHH and Ms. Brady's use of Maxus $6 million to satisfy the IRS's claims and liens.[87] Mr. Hammer testified that he "first learned that Texas RHH had unpaid taxes in late November 2012"[88] and that he "[did] not recall exactly when" he learned that Ms.

---

[84] Adv. ECF No. 356 at pgs. 35–43 and 124–25.
[85] Trustee's Ex. 161, pgs. 9–11.
[86] Trustee's Ex. 161, pg. 15, lines 3–4.
[87] Trustee Ex. 161, pgs. 41–67.
[88] Trustee Ex. 161, pg. 51, lines 5–6.

Brady had used a portion of the Maxus's funds to pay the IRS claim.[89] But he also admitted that "I did learn about it on December 31st, 2012."[90] Finally, in response to a question asking if he "had a duty to inform Maxus that its money had been used to pay off a debt to the IRS," Mr. Hammer answered "no." [91]

The clear and overarching focus of Maxus' attorney's questions posited to Mr. Hammer were to determine (i) what Mr. Hammer knew about the IRS claim and lien against Texas RHH, (ii) when he became aware of its existence, (iii) when he discovered Ms. Brady had paid off the IRS claim, (iv) when he discovered that Ms. Brady had used a portion of the Maxus $6 million funds to pay the IRS claim, and (v) why he failed to disclose what he knew to Maxus prior to closing the APA transaction.

A break was then taken. After the "long break,"[92] counsel for the Debtors adjourned the deposition stating:

> I know we've had a long break. And the purpose of that break was that, in my opinion, the questions you've asked today, and specifically the ones you asked immediately before the break, put my law firm on notice of a claim that Maxus has or intends to allege against my firm and one or more of its members. And because of that notice that I now have and the opinion that I've formed about that, my obligation from a firm standpoint is to put my carrier on notice.
>
> And in light of that, I believe also that that creates potential conflicts of interests between my clients and my law firm. And those conflicts are going to have to be dealt with by, in all probability, bringing in new counsel.

---

[89] Trustee Ex. 161, pg. 61, lines 5–11.
[90] Trustee Ex. 161, pg. 61, lines 5–14.
[91] Trustee Ex. 161, pg. 64, line 24 through pg. 65, line 2.
[92] Trustee Ex. 161, pg. 66, lines 5–6.

And in – on that basis, we're going to adjourn the deposition
today.[93]

At no time during Mr. Hammer's deposition did Maxus' counsel suggest that Mr. Hammer
and/or BWW were also representing Maxus in the APA transaction. To the contrary, Maxus'
counsel specifically acknowledged that Mr. Hammer and BWW were counsel to Ms. Brady and
Texas RHH only and that the Defendants were not represented by counsel in the APA transaction:

> Q. [by Maxus' counsel] So prior to the closing of the asset
> purchase agreement, *you, the attorney for Ms. Brady and
> Texas RHH,* had conversations with Angie King, Steven
> Anderson, and Stevan Hammond; is that right?
>
> A. [by Mr. Hammer] that is correct.
>
> Q. And none of those three individuals are an attorney, right?
>
> A. To my knowledge.[94]
>
> . . .
>
> Q. Have you ever sought a legal opinion that it is okay under
> the Texas Rules of Professional Responsibility not to
> disclose *to the party in another transaction that you know is
> unrepresented* that its money had been used to pay a debt
> prior to the closing of an asset purchase agreement?
>
> A. Your question was, have I ever sought a legal opinion to
> that effect"
>
> Q. Yes, Sir.
>
> A. No.[95]

Based on the Court's review and analysis of Mr. Hammer's deposition, the Court finds and
concludes that the questions asked by Maxus' attorney during the deposition were within the range

---

[93] Trustee Ex. 161, pg. 66, lines 5–21.
[94] Trustee Ex. 161, pg. 63, lines 3–10.
[95] Trustee Ex. 161, pg. 65, lines 5–10.

of reasonableness and not indicative of a plan to willfully or intentionally interference with the

Debtors' contract with BWW.[96]

Therefore, without other credible corroborating evidence, the Court finds and concludes

that the questions asked by Maxus' counsel during Mr. Hammer's deposition fails to establish, or

even suggest, that the Defendants were prosecuting a sinister plan to tortiously interfere with the

Debtors' contract with BWW.

> b.  *The Motion for Withdrawal of Counsel*[97]

The Trustee next points to BWW's *Motion for Withdrawal of Counsel*[98]—filed the day

after Mr. Hammer deposition was adjourned—as corroborating evidence of the Defendants' plan

to tortiously interfere with the Debtors' contract with BWW. BWW represented the following as

the reason for its withdrawal:

> [I]t became apparent in the questioning that [Maxus]
> believes and alleges that it has claims against the law firm of
> Bourland, Wall & Wenzel, P.C. and/or one or more of its
> members. When this became apparent from the questioning,
> the oral deposition was adjourned and [Maxus]'s counsel
> was advised that such claim *created a potential conflict of*
> *interest between the law firm of Bourland, Wall & Wenzel,*
> *P.C. and its clients, who are [Debtors] in this proceeding.*[99]

Nowhere in the motion does BWW assert or contend that it was withdrawing because

Maxus had claimed that BWW was its counsel in the APA transaction. Rather, BWW represented

that it was withdrawing because of *potential* claims the Defendants might raise against BWW for

---

[96] To be clear, the Court makes no findings of fact or conclusions of law concerning the merits or viability of alleged claims Maxus might believe it has or held against Mr. Hammer or BWW for fraud, misrepresentation, negligence, breach of contract, breach of fiduciary duty, or malpractice. Additionally, the Court makes no findings of fact or conclusions of law concerning actual BWW's motive(s) or rationale when the firm made its decision to withdraw from representing Ms. Brady and Texas RHH in the State Court Litigation.
[97] Trustee Ex. 162; Adv. ECF No. 401 at pg. 17.
[98] Maxus Ex. 34.
[99] Maxus Ex. 34 (emphasis added).

its role, if any, in the nondisclosure of the IRS claim and its payment. Any such potential claims asserted against BWW would cause a conflict between BWW and its client—the Debtors—which would require BWW to withdraw as counsel to the Debtors in the State Court Lawsuit.

Consequently, the Court finds and concludes that BWW's motion to withdraw as counsel for the Debtors in the State Court Lawsuit fails to establish, or even suggest, that the Defendants had a nefarious plan to tortiously interfere with the Debtors' contract with BWW. Also important in the Court's final analysis is that BWW withdrew from representing the Debtors the day after the deposition of Mr. Hammer.

### c.   *The Kelly Hart & Hallman LLP invoices*[100]

The Trustee next points to the Kelly Hart & Hallman LLP invoices as support to establish that the Defendants had a plan to willfully interfere with the Debtors' contract with BWW. The Trustee notes that Maxus was initially represented in the State Court Lawsuit by Estes Okon Thorne & Carr, PLLC.[101] The Trustee then contends that in or around mid-July 2015, Mr. Hammond made the unilateral decision to devise a plan to tortiously interfere with the Debtors' contract with BWW. To carry out such a plan, the Trustee first contends that Mr. Hammond made the unilateral decision for Maxus to terminate the Estes Law Firm and in its place retain Kelly Hart & Hallman, LLP.[102] The Trustee then suggests that "[u]pon KHH's retention, Maxus and Hammond developed a plan to allege claims against BWW so Maxus and Hammond could disqualify BWW and pursue BWW's insurance policy."[103]

---

[100] Trustee Ex. 184; Adv. ECF No. 393 at pgs. 40–59.
[101] Adv. ECF No. 306, pg. 23 ¶ 12; *see also* Adv. ECF No. 356, pg. 34, line 23 through pg. 35, line 2.
[102] Adv. ECF No. 356, pg. 34, line 23 through pg. 8.
[103] Adv. ECF No. 306, pg. 3 ¶ 5.

In support of this contention, the Trustee points to a time entry made on September 4, 2015, by Mr. Derek Anderson ("***Mr. D. Anderson***") for an "office conference with M. Anderson" that lasted for 30 minutes.[104] Mr. D. Anderson is a litigation attorney with Kelly Hart & Hallman, LLP and his practice focuses primarily on insurance coverage related issues in commercial litigation.[105] The Trustee suggests that this half-hour office conference with Mr. D. Anderson supports the Trustee's theory that the Defendants and their counsel were devising a plan to tortiously interfere with the Debtors' contract with BWW.

Mr. D. Anderson, however, testified credibly that the actual topic discussed during that 30 minute office conference was a landlord-tenant insurance coverage dispute between BP Chaney and Maxus—not a potential malpractice dispute involving BWW.[106] Mr. D. Anderson's testimony was corroborated by a letter dated September 1, 2015, from BP Chaney to Maxus.[107] Additionally, Mr. D. Anderson testified further that he had never met Mr. Hammond until the day he testified in this Adversary Proceeding. Nor had Mr. D. Anderson ever communicated with any current or prior employee of Maxus.

The Court finds and concludes that the Kelly Hart & Hallman LLP invoices fail to provide any credible support of the Trustee's contention that the Defendants were engaged in a plan to tortiously interfere with the Debtors' contract with BWW.

### d. The Plaintiff's Original Petition[108] filed by Maxus against BWW

The only evidence that arguably supports the Trustee's contention that the Defendants had a plan to tortiously interfere with the Debtors' contract with BWW is the undisputed fact that on

---

[104] Trustee Ex. 184, pg. 16.
[105] Adv. ECF No. 393, pg. 41, lines 2–13.
[106] Adv. ECF No. 393, pg. 43, line 18 through pg. 48, line 16.
[107] Maxus Ex. 29.
[108] Trustee Ex. 169.

November 18, 2015—two months *after* BWW withdrew from representing the Debtors in the State Court Lawsuit—Maxus filed a lawsuit against BWW in the 96th Judicial District Court of Tarrant County Texas (the "***BWW Lawsuit***")[109] claiming BWW (i) represented Ms. Brady, Texas RHH, *and Maxus* in the APA Sale Transaction; (ii) committed legal malpractice and professional negligence against Maxus; (iii) breached its fiduciary duty to Maxus; and, in the alternative, (iv) committed fraud against Maxus.

Although Maxus alleged in the BWW Lawsuit that BWW and Mr. Hammer represented Maxus in the APA sale transaction with Texas RHH, there is not one shred of *credible* evidence in the record to suggest or even hint that BWW and Mr. Hammer ever representing Maxus or Mr. Hammond. Rather, the clear and convincing evidence in this Adversary Proceeding—including the credible testimony of Mr. Hammer, Ms. Brady, and Ms. King and corroborating exhibits— unequivocally established that neither BWW nor Mr. Hammer had ever represented Maxus or Mr. Hammond, let alone in the APA Sale Transaction. Additionally, as noted earlier, Mr. Hammond's testimony to the contrary was void of any credibility. Further Maxus's ultimate filing of a notice of non-suit dismissing the BWW Lawsuit further illustrates that the BWW Lawsuit lacked merit.[110]

Throughout the pendency of this Adversary Proceeding and during the trial Mr. Hammond demonstrated his penchant for playing litigation games and pursuing frivolous claims and positions. But the mere filing of the BWW Lawsuit, itself, is not sufficient evidence to establish that the Defendants were engaged in a plan to tortiously interfere with the Debtors' contract with BWW when Mr. Hammer's deposition was taken. Rather, the credible evidence suggests that Maxus (and Mr. Hammond) decided to pursue the meritless claim against BWW for malpractice

---

[109] Trustee Ex. 169.
[110] Trustee Ex. 193.

*after* BWW had already withdrawn from representing the Debtors in the State Court Lawsuit. To be clear, the Court affirmatively finds and concludes that Mr. Hammond's and Maxus' claims that BWW represented Maxus in the APA transaction and committed malpractice against Maxus are frivolous and without any merit whatsoever.

But, as previously noted, the Court makes no findings of fact or conclusions of law concerning the merits, if any, of Maxus's alleged claims against BWW for fraud or breach of a duty to Maxus relating to the APA transaction. Additionally, the Court makes no findings of fact or conclusions of law concerning BWW's motive(s) or rationale when the firm made the decision to withdraw from representing Ms. Brady and Texas RHH in the State Court Litigation two months earlier based on questions asked during Mr. Hammer's deposition. Again, the mere fact that the Debtors had listed Mr. Hammer as a person with knowledge of relevant facts in the State Court Lawsuit was sufficient for the Defendants to depose Mr. Hammer in the State Court Lawsuit to determine what non-privileged facts he knew that may have been relevant in the State Court Lawsuit

Consequently, the Court finds and concludes that Maxus' after-the-fact frivolous BWW Lawsuit, itself, is not sufficient evidence to satisfy the Trustee's burden to establish that the Defendants were engaged in a plan to tortiously interfere with the Debtors' contract with BWW *which caused* BWW to withdraw as lead counsel to Ms. Brady and Texas RHH in the State Court Lawsuit.

### e.  *The testimony of Ms. King*

Finally, the Trustee contends that Ms. King's testimony supports a finding that the Defendants' willfully intended to tortiously interfere with the Debtors' contract with BWW. The

Court disagrees. Although Ms. King testified that Mr. Hammond discussed "going after BWW"[111] and the "availability of the insurance policy of BWW"[112] with her, she could not specifically remember when those discussions had taken place.[113] The evidence suggests, however, that Ms. King's discussions with Mr. Hammond more likely occurred in or around the November 2015 timeframe when Maxus filed the BWW Lawsuit. Additionally, Ms. King testified that she had no input nor was she consulted by Mr. Hammond when he made the decision to (i) terminate the Estes Law Firm;[114] (ii) retain the Kelly Hart Law Firm in July 2015;[115] or (iii) to file the BWW Lawsuit.[116] Nowhere in Ms. King's testimony is there direct corroborating evidence that the Defendants had devised a scheme to intentionally tortiously interfere with the Debtors' contract with BWW.

### f. Conclusion

After carefully considering the evidence in the record, the Court finds and concludes that the Trustee failed to establish, by a preponderance of the evidence, that the Defendants willfully and intentionally interfered with the Debtors' contract with BWW as required for a claim of tortious interference with contract.

### 3. Interference was the Proximate Cause of Plaintiffs' Injury

Because the Court finds that the Trustee failed to satisfy the second element required for a viable tortious interference claim against the Defendants, the Court need not address the final two elements necessary to establish a tortious interference claim. But even if the Trustee had satisfied

---

[111] Adv. ECF No. 365, pg. 36, line 23 through pg. 37, line 4.
[112] Adv. ECF No. 356, pg. 37, lines 5–11.
[113] Adv. ECF No. 356, pg.37, lines 2-4.
[114] Adv. ECF No. 356, pg. 34, lines 23–25.
[115] Adv. ECF No. 356, pg. 35, lines 1–8.
[116] Adv. ECF No. 356, pg. 63, lines 3–8.

the second element for a viable claim of tortious interference, the Court also finds and concludes that the Trustee failed to satisfy the third "proximate cause" element by a preponderance of evidence. To satisfy the "proximate cause" element, the Trustee must establish that the alleged interfering act (primarily, the Hammer deposition) caused BWW to withdraw. There was nothing in the Hammer deposition evidencing an improper plan to tortiously interfere with the Debtors' contract with BWW which then caused BWW to withdraw from representing the Debtors in the State Court Lawsuit. BWW likely had its own reasons for withdrawing, and as previously detailed, the subsequent BWW Lawsuit filed by Maxus does not constitute an interfering act that was the "proximate cause" of BWW's withdrawal in the State Court Lawsuit.

After carefully considering the evidence in the record, the Court finds and concludes that the Trustee failed to establish, by a preponderance of the evidence, that the Defendants' alleged interfering acts caused BWW to withdraw as the Debtors' attorneys in the State Court Lawsuit as required for a claim of tortious interference with contract.

### 4.    *Damages*

The final element necessary for a viable claim for tortious interference of contract is the suffering of actual damages caused by the tortious interference. The only potential damages alleged by the Debtors were increased legal fees incurred by the Hanshaw Kennedy law firm that were necessary to be brought up to speed following the withdrawal of BWW.[117] Proof of such damages, if any, were reserved to be liquidated at a future date if the Court found that the other elements for the tortious interference claim had been satisfied. Because the Court finds and

---

[117] Ms. Brady admitted in her testimony that the Hanshaw Kennedy law firm had done a fine job in representing her and the other Debtors in the State Court Lawsuit; therefore, other than increased legal fees, the Debtors did not suffer any other damaged caused by BWW's withdrawal. *See* Adv. ECF No. 354, pg. 62, lines 16–22; pg. 77, line 25 through pg. 78, line 4; Adv. ECF No. 353, lines 22–25.

concludes that the Trustee failed to satisfy his burden of proof to establish the second and third

required elements for a tortious interference claim, the damages element has been rendered moot.

### 5. *Conclusions regarding Trustee's Count One*

After carefully considering the evidence in the record, the Court finds and concludes that

the Trustee failed to establish, by a preponderance of the evidence, each of the required elements

for a claim of tortious interference with contract. Consequently, the Trustee's claims in Count One

are ***DENIED***.

### 6. *Defendants' applicable affirmative defenses*

Because the Trustee failed to satisfy each of the required elements for a tortious

interference with contract claim on the merits, the Court need not analyze the Defendants'

applicable affirmative defenses to Count One. Consequently, the Defendants' affirmative defenses

to Count One are moot.

**D. Count Two—Turnover of Debtors' Records/Value of Accounts Receivable (formerly
turnover of the 43 Boxes of Documents)**

For the reasons detailed *supra* in § III.B., the Sanction Orders and Pre-Trial Order

effectively modified the Trustee's turnover claim in Count Two. The Sanction Orders found that

the "value" of the destroyed 43 Boxes of Documents[118] to the Texas RHH bankruptcy estate was,

in part, to enable the Trustee to prove-up *and collect* the outstanding accounts receivable that may

still be due and owing to the Texas RHH bankruptcy estate from third party obligors, such as

Medicare, private insurance, or other third parties.

Consequently, the Court issued the following adverse inference sanction against the

Defendants: rather than the Trustee having to prove-up the value and collectability of Texas RHH's

---

[118] The subject of the original Count Two turnover request.

accounts receivable in the amount of $2,888,212.90, the burden of proof was shifted to the Defendants to establish, by a preponderance of the evidence, that the actual *collectible* value of the Texas RHH accounts receivable is less than the $2,888,212.90 asserted by the Trustee.[119] As an additional sanction, the Court also ordered that the Defendants were not permitted to assert a statute of limitations affirmative defense to the collectability of the outstanding Accounts Receivable.[120]

Based on the modified Count Two, the Trustee contends that "[t]he amount of the outstanding accounts receivable is at least $2,888,212.90."[121] Therefore, the Trustee concludes that he is entitled to a judgment for Count Two of $2,888,212.90 plus attorneys' fees.

It is important to keep in mind that the $2,888,212.90 of "face value" accounts receivable asserted by the Trustee as still owing and unpaid, had accrued on or before December 31, 2012— over eleven years ago. Neither party offered into evidence a detail accounts receivable aging report for the Texas RHH accounts receivable as of December 31, 2012.[122] But a consolidated balance sheet was admitted into evidence that indicates the Texas RHH accounts receivable balance as of December 31, 2012, was $3,643,733, broken down as follows:

| | |
|---|---|
| Accounts Receivable – Medicare | $1,710,031 |
| Accounts Receivable – Medicare Managed Care | $ 657,643 |
| Accounts Receivable – Private Insurance | $1,276,059 |
| Allowance for Doubtful Accounts | <$2,049,007> |
| Net Accounts Receivable | $1,594,726[123] |

---

[119] Adv. ECF No. 306, pg. 5, ¶ 12; *see generally* Adv. ECF No. 217.
[120] Adv. ECF No. 217, pg. 13 and Adv. ECF No. 244, pg. 2.
[121] Adv. ECF No. 306, pg. 5 ¶ 12.
[122] The last detailed accounts receivable report prepared by or for Texas RHH was dated as of October 31, 2012, which reflected total accounts receivables of $3,019,217, less allowance for uncollectible accounts of <$1,630,106>, resulting in a net accounts receivable balance of $1,389,111.
[123] Maxus Ex. 144, pg. 3; *see also* Maxus Ex. 146 (email dated February 28, 2017, from Ms. Brady to her CPA asserting the total accounts receivable balance as of December 31, 2012, was $3,643,733).

Additionally, the parties stipulated that Maxus remitted to Texas RHH and/or Ms. Brady $840,475.12 in Texas RHH Accounts Receivable proceeds—collected by Maxus after the APA closed on December 31, 2012.[124]

The Defendants—who now have the burden of proof—contend that the "face value" of the current outstanding Texas RHH accounts receivable is (and has been for years) worthless and that Count Two should be denied, in full. In support of their contention, the Defendants rely primarily on the following evidence:

- The Texas RHH Bankruptcy Schedules;

- Ms. Brady's 2012 Amended Tax Return and Related Documents; and

- The Expert Testimony provided by (i) Ms. Dawn Hughes; and (ii) Mr. Joseph Taylor.

## 1.    *The Texas RHH Bankruptcy Schedules*

The Defendants first point to the Texas RHH Bankruptcy Schedule A/B signed under penalty of perjury by Ms. Brady and filed on September 20, 2017. Texas RHH asserted that the "face amount" of its outstanding accounts receivable was $2,803,257.88, but the "current value" of the outstanding accounts receivable was $0.00.[125]

On April 10, 2018, Texas RHH filed an amended Schedule A/B, and once again, the Texas RHH accounts receivables were listed exactly as they were in the original schedules—face value $2,803,257.88 less doubtful or uncollectible accounts of $2,803,257.88 resulting in a net value of $0.00.[126]

---

[124] Adv. ECF No. 306, pg. 24 ¶ 9; *see also* Trustee Exs. 266 and 267. Although Ms. Brady stipulated in this Adversary Proceeding that Maxus had remitted $840,475.12 in accounts receivable proceeds to Texas RHH, in her February 28, 2017, email to her CPA, she represented that Texas RHH had collected only $755,520.11 in accounts receivable proceeds since December 31, 2012.

[125] Maxus Ex. 48, pg. 2.

[126] Maxus Ex. 56, pg. 2.

Consequently, the Defendants contend that Ms. Brady and Texas RHH have admitted and should be estopped from claiming that as of the date Texas RHH filed its bankruptcy petition, the value and collectability of the Texas RHH Accounts Receivable was $0.00.

### 2. *Ms. Brady's 2012 Amended Tax Return and Related Documents*

The Defendants next point to Ms. Brady's 2012 Amended U.S. Individual Tax Return[127] and other corroborating evidence as evidence that the Texas RHH accounts receivable had no value.

On May 31, 2016, the CPA firm of Dunn & Dill, P.C. ("***Dunn & Dill***") was retained to, among other tasks, assist Ms. Brady with her federal income tax issues and filings.[128] Accordingly, on January 9, 2017, Ms. Alexis Stossel—a firm administrator with Dunn & Dill—sent an email to Ms. Brady seeking answers to questions and requests for information necessary for the preparation of Ms. Brady's 2012 Amended Tax Return.[129] On February 28, 2017, Ms. Brady responded to Ms. Stossel's request for information stating, in part:

> I also kept all of the accrued accounts receivable for services provided on or before 12/31/2012. AS (sic) of Dec. 31, 2012 that balance was $3,643,733.00 of which I only collected $755,520.11 and left a balance of ***$2,888,212.90*** as uncollected accounts receivable in 2013.[130]

Thereafter, on June 22, 2017, Ms. Brady filed her 2012 Amended Tax Return which included a deduction in Schedule C applicable to Texas RHH for ***$2,888,212***.[131] Defendants contend that this deduction on Schedule C for "returns and allowances" confirms that in 2017

---

[127] Maxus Ex. 132 (the "***2012 Amended Tax Return***").
[128] Maxus Ex. 262.
[129] Maxus Ex. 146, pg. 3.
[130] Maxus Ex. 146, pg. 1 (emphasis added).
[131] Maxus Ex. 132, pg. 4.

Texas RHH wrote off its outstanding face value of Texas RHH's accounts receivable as worthless in tax year 2012.

As further corroborating evidence, the Defendants point to a Texas RHH financial statement provided by Ms. Brady to Dunn & Dill representing that the Texas RHH accounts receivable balance of **$2,888,212.90** was "uncollectible."[132] Although Ms. Brady attempted to explain away her handwritten note on the financial statement—which stated: "$2,888,212.90 uncollectable A/R Balance,"[133]—her explanation was neither credible nor persuasive.

Next, the Defendants contend that the video deposition testimony[134] of Mr. William Dunn ("**Mr. Dunn**") further confirms that the remaining "face value" of Texas RHH Accounts Receivable is worthless. Mr. Dunn testified that the source of the financial information inserted in Schedule C to the 2012 Amended Tax Return filed with the IRS came directly from Ms. Brady.[135] According to Mr. Dunn, he relied upon Ms. Brady to provide full and accurate information for the 2012 Amended Tax Return.[136] Mr. Dunn testified further that the February 28, 2017, email from Ms. Brady to Ms. Stossel was a significant part of Dunn & Dill's efforts to obtain accurate information to prepare the 2012 Amended Tax Return.[137] Finally, Mr. Dunn confirmed that the $2,888,212.90 figure listed on line 2 of Schedule C to the 2012 Amended Tax Return as "returns and allowances," was an affirmative representation to the IRS that the $2,888,212.90 of Accounts Receivable was worthless and constituted a write off of that amount for taxable year 2012.[138]

---

[132] Maxus Ex. 159. In her testimony, Ms. Brady reluctantly admitted on cross-examination that she had made the handwritten note on Exhibit 159. *See* Adv. ECF No. 355, pg. 35, line 5 through pg. 36 line 2.
[133] Maxus Ex. 146.
[134] Portions of Mr. Dunn's deposition testimony was played at trial. *See generally*, Adv. ECF No. 392, pg. 142, lines 2–17.
[135] Trial Recording for Dec. 5, 2023, 03:37:20 PM – 03:38:42 PM; *see also* Adv. ECF No. 392, pg. 142, lines 2–17.
[136] Trial Recording for Dec. 5, 2023, 03:37:20 PM – 03:38:42 PM; *see also* Adv. ECF No. 392, pg. 142, lines 2–17.
[137] Maxus Ex.146, pg. 1.
[138] Trial Recording for Dec. 5, 2023, 03:44:10 PM – 03:44:35 PM; *see also* Adv. ECF No. 392, pg. 142, lines 2–17.

The Trustee argues that the 2012 Amended Tax Return was ultimately rejected by the IRS. But the IRS's rejection of the tax return on other grounds does not diminish the fact that that Ms. Brady filed the tax return under penalty of perjury confirming that the $2,888,212 face value of Texas RHH accounts receivable was worthless and uncollectible in tax year 2012. Additionally, the Defendants point to Ms. Brady's Amended Schedule A/B[139] filed in her individual bankruptcy case on September 21, 2017, confirming that Ms. Brady was entitled to a federal income tax refund based primarily on the write-off of the Texas RHH accounts receivable reflected in her 2012 Amended Tax Return filed a few months earlier.[140]

### 3.  *Expert Testimony*

#### a.  *Ms. Dawn Hughes*

Defendants called Ms. Dawn Hughes ("**Ms. Hughes**") as an expert witness to assess "Texas RHH's accounts receivable report and determine the collectability."[141] Based on her knowledge, skill, experience, training, and education, the Court found her testimony to be credible, informative, and persuasive on the issue of the value of the Texas RHH accounts receivable. Ms. Hughes' experience in the healthcare industry spans more than 30 years, and she owns and operates Home Health Billing to Go.[142] In preparation for her testimony, she reviewed episode detail reports, aging accounts receivable summary for Texas RHH, and the Texas RHH Kinnser system.[143]

Upon reviewing Texas RHH's alleged accounts receivable, Ms. Hughes determined that, "with respect to Medicare claims, anything that wasn't collected by April 30th, 2014, wasn't

---

[139] Maxus Ex. 49.
[140] Maxus Ex. 49, pg. 5.
[141] Adv. ECF No. 392, pg. 30, lines 19–20.
[142] Adv. ECF No. 392, pgs. 31–32.
[143] Adv. ECF No. 392, pg. 34.

collectable. And with respect to private insurance, anything not collected by January 1st, 2014, was not collectable."[144] In conducting her analysis, Ms. Hughes started by looking to Texas RHH's accounts receivable aging report from October 31, 2012.[145] According to Ms. Hughes, the length of time taken to collect a receivable based on a claim is important due to the "regulatory requirements and filing requirements," which limit the amount of time a recipient has to file a claim against Medicare or private insurance for services rendered.[146]

For Medicare, claims must be submitted "365 days from the starting date of the episode."[147] Ms. Hughes credibly explained that Medicare claims are typically paid within 30 days of submission.[148] Ms. Hughes testified that if the balance of any Medicare claim included in the Texas RHH Accounts Receivable "wasn't collected by April 2014, it was not collectable."[149] The Court finds and concludes that Ms. Hughes' methodology, assumptions and assessments which formulated her opinion were reasonable and credible.

For private insurance claims, Ms. Hughes testified that the timeline is much tighter than the timeline for Medicare claims. The general submission deadline for private insurance claims is 90 days, but contracts back in 2012 could also be for 120 or 180 days.[150] Apart from claims with Veterans Affairs, the longest period Ms. Hughes had ever seen was one year, and when asked if she had ever seen a period of three to five years allowed for submission of claims, she replied, "Never."[151] Further, as with Medicare claims, Ms. Hughes testified that private insurance is also

---

[144] Adv. ECF No. 392, pg. 35, lines 2–5.
[145] Maxus Ex. 7; *see also* Adv. ECF No. 392, pg. 35, lines 19–24.
[146] Adv. ECF No. 392, pg. 38, lines 9–20.
[147] Adv. ECF No. 392, pg. 43, line 2.
[148] Adv. ECF No. 392, pg. 43, lines 9–10.
[149] Adv. ECF No. 392, pg. 50, lines 22–23.
[150] Adv. ECF No. 392, pg. 57, lines 11–13 and 17–23.
[151] Adv. ECF No. 392, pg. 57, line 25 through pg. 58, line 12.

subject to prompt pay laws so that "clean claims" not paid within 30 days are subject to interest charges, which prevents most insurance providers from waiting longer than 30 days to remit payment.[152] Ultimately, Ms. Hughes arrived at the conclusion that any claims included in the Texas RHH Accounts Receivable but not collected by January 30, 2014, were uncollectible.[153] Again, the Court found Ms. Hughes' methodology, assumptions and assessments which formulated her expert opinion were reasonable and credible.

Although Ms. Hughes believed that most of the claims underlying the Texas RHH Accounts Receivable were uncollectible as of January or April of 2014, Ms. Hughes did admit on cross examination that in 2015 "there were a small number of claims, maybe five claims that were paid."[154] However, Ms. Hughes expressed that the limited number of claims paid in 2015 did not change her conclusions or opinion that the Texas RHH Accounts Receivable had a *de minimis* value, if at all, as of December 31, 2014.[155]

Ms. Hughes' opinion was further supported by the deposition testimony of Mr. Richard Furtek ("**Mr. Furtek**"), who had been retained by Texas RHH, in part, to organize the company's books and records beginning in 2012.[156] When asked whether the accounts receivable from December 31, 2012, would be uncollectible as of December 31, 2013, Mr. Furtek testified:

> In more precise language, I would say that the – the likelihood of any further collection beyond December 31, 2012 would be very small. There would be – there would be instances, in my experience, where something does go beyond a year but not much. It would not be a – it would be immaterial.[157]

---

[152] Adv. ECF No. 392, pg. 59, lines 11–21.
[153] Adv. ECF No. 392, pg. 63, lines 18–19.
[154] Adv. ECF No. 392, pg. 74, lines 17–22. *See also* discussion *infra* in § III.E.
[155] Adv. ECF No. 392, pg. 135, lines 16–19.
[156] Maxus Ex. 260, pg. 19, lines 9–12 and 17–23.
[157] Maxus Ex. 260, pg. 85, line 22 through pg. 86, line 7.

Mr. Furtek further confirmed that the collectible amount would be *de minimis*.[158]

The Court finds and concludes that Ms. Hughes' expert testimony was credible and persuasive in concluding that Texas RHH's outstanding accounts receivable as of December 31, 2014, was worthless or in the best-case scenario, *de minimis*.

> b.  *Mr. Joseph Taylor*

Defendants also called Mr. Joseph Taylor ("***Mr. Taylor***") as an expert witness.[159] Based on his knowledge, skill, experience, training, and education, the Court found his testimony to be credible, informative, and persuasive on the issue regarding Ms. Brady's tax returns. Mr. Taylor's experience proves extensive in tax filings.[160] In preparing for his testimony, Mr. Taylor reviewed emails between Ms. Brady and her CPA, income tax returns, the IRS transcript for years 2012 through 2015, the depositions of Ms. Brady and Mr. Dunn, and numerous other documents related to Texas RHH and Ms. Brady' tax filings.[161] Based on his review and analysis of the information he was provided, Mr. Taylor formed an opinion that "the $2,888,212 was not collectable at the end of 2012, that it was worthless, wholly worthless at the end of 2012."[162]

The Court finds and concludes that Mr. Taylor's methodology, assumptions, and assessments which formulated his expert opinion were reasonable and credible. The Court further finds and concludes that Mr. Taylor's expert testimony was credible and persuasive in concluding that Texas RHH's outstanding accounts receivable as of December 31, 2012, was worthless or in the best-case scenario, *de minimis*.

---

[158] Maxus Ex. 260, pg. 86, lines 10–11.
[159] Adv. ECF No. 392, pg. 142.
[160] Adv. ECF No. 392, pg. 143, line 18 through pg. 153, line 13.
[161] Adv. ECF No. 392, pg. 156, line 9 through pg. 159, line 17.
[162] Adv. ECF No. 392, pg. 160, lines 12–14.

### 4. *Conclusions regarding Trustee's Count Two*

Because of the adverse inference sanctions placed on Defendants, they had the burden to establish that the Texas RHH Accounts Receivable was worthless, without the ability to assert any applicable statute of limitations affirmative defenses. Based on the credible evidence in the record, the Court finds and concludes that the Defendants have established, by a preponderance of the evidence, that the Texas RHH Accounts Receivable were worthless (i) as early as December 31, 2012 (as testified by Mr. Tayler and Mr. Furtek), (ii) by December 31, 2014 (as testified by Ms. Hughes), and (iii) clearly prior to the time Texas RHH filed its bankruptcy case in 2017.

Because the Defendants satisfied their burden (as required by the Sanction Orders and Pre-Trial Order), the Trustee's claims in Count Two, as modified, are ***DENIED***.

### 5. *Defendants' applicable affirmative defenses*

Because the Trustee's claims in Count Two, as modified, are denied, the Court need not analyze the Defendants' applicable affirmative defenses to Count Two. Consequently, the Defendants' affirmative defenses to Count Two are moot.

## E. Count Three—Turnover of Accounts Receivable Proceeds

The Trustee contends that Maxus failed to remit to Texas RHH (and now the Trustee) all the proceeds of its accounts receivable that Maxus collected or was paid from and after December 31, 2012, through the present.[163]

### 1. *Remittances through 2014*

The parties stipulated that after the APA closed, Maxus remitted to Texas RHH and/or Ms. Brady $840,475.12 in proceeds of Texas RHH Accounts Receivable collected by Maxus.[164] Ms.

---

[163] Adv. ECF No. 306, pg. 9 ¶¶ 32 and 33; pg. 27 ¶ 21; pg. 29 ¶¶ 34 and 35.
[164] Adv. ECF No. 306, pg. 24 ¶ 9; *see also* Trustee Exs. 266 and 267.

Brady testified further that the last such remittance received from Maxus was in or around November 2014.[165] The Defendants did not offer any evidence to contest or controvert Ms. Brady's testimony that the last remittance by Maxus was in or around November 2014.

On the other hand, the Trustee did not offer any evidence to suggest that prior to November 2014, Maxus had received proceeds of Texas RHH's accounts receivable but failed to remit such proceeds. Consequently, the credible evidence established that as of December 31, 2014, Maxus had delivered all proceeds it had received through that date to Texas RHH and/or Ms. Brady.

**2.       *Remittances due from Maxus from and after January 1, 2015***

The credible evidence established that Maxus received Texas RHH accounts receivable proceeds from and after January 1, 2015, but failed to remit such proceeds to Texas RHH in breach of the APA. Before the Court addresses that credible evidence, however, the Court must first address, yet again, another intentional and willful discovery abuse committed by Mr. Hammond and Maxus that is relevant to Count Three for the time period from and after January 1, 2015.

*a.   Maxus' Mid-Trial Document Production*

After having completed ten days of trial—but during a several months break before reconvening the trial—the Defendants' counsel sent an email to the Trustee's counsel attaching a letter with a link to approximately 16,500 pages of documents (the "***Mid-Trial Produced Documents***") that had not previously been previously produced by the Defendants.[166] Many of the documents are relevant to the Trustee's burden of proof in Count Three and were responsive to document requests and orders compelling their production going back years.

---

[165] Adv. ECF No. 353, pg. 96, lines 3-7; *see also* Maxus Ex. 21.
[166] Trustee Ex. G. *See generally* Adv. ECF No. 361 and ECF No. 391 at pg. 8, lines 5–10.

After receiving the Mid-Trial Produced Documents, the Trustee filed a motion seeking further sanctions against Mr. Hammond and Maxus.[167] After conducting (yet another) discovery abuse evidentiary hearing, the Court found the Defendants' failure to timely produce the Mid-Trial Produced Documents, years earlier, was "stunning," "cavalier," and a "complete disregard" of the Defendants' obligation to have timely produced the documents years earlier.[168] Following the hearing, the Court entered its Mid-Trial Sanctions Order.[169]

The Mid-Trial Sanctions Order provides, in part, that the Defendants were precluded from offering into evidence or soliciting testimony regarding the Mid-Trial Produced Documents which could assist the Defendants in satisfying their burden of proof in Count Two. The Court also granted the Trustee's request for reimbursement of his reasonable costs and attorneys' fees for having to file and prosecute the Mid-Trial Sanctions Motion, which will be liquidated in a future hearing along with the liquidation of the fee award in the Sanction Orders.

*b. Remittances received by Maxus from and after 2015*

Although the evidence supports a finding that Maxus remitted all of Texas RHH's accounts receivable proceeds that Maxus had received through 2014, the uncontroverted evidence also established that Maxus failed to remit any proceeds of Texas RHH's accounts receivable Maxus may have collected in 2015 and beyond.

The Trustee first points the testimony of Maxus' own expert—Ms. Hughes—who testified that Maxus had, indeed, collected proceeds of Texas RHH accounts receivable during 2015.[170] Ms.

---

[167] *Trustee's Motion for Further Sanctions Against Defendants*, Adv. ECF No. 361 (the "***Mid-Trial Sanctions Motion***").
[168] Adv. ECF No. 391, pg. 158, lines 11–17; pg. 159, lines 6–12; pg. 161, lines 8–22.
[169] *Order Regarding Plaintiff's Motion for Further Sanctions Against Defendants*, Adv. ECF No. 389 (the "***Mid-Trial Sanctions Order***").
[170] Adv. ECF No. 392, pg. 74, lines 5–24; pg. 75, lines 17–21; pg. 92, lines 21–23; pg. 106, lines 6–15; pg. 134, line 11 through pg. 135, line 15.

Hughes testified that she had been provided access to the Kinnser database billing system. The Kinnser database contains detailed information and data related to the claims made by the Debtors with Medicare and private insurance companies for services billed during Texas RHH's operations through December 31, 2012. Consequently, the Kinnser database is a significant source from which the Debtors' accounts receivable reports are generated.[171]

Ms. Hughes testified that upon her review of the Kinnser database, she observed that "maybe five claims" of "about $75,000 in care improvement claims [] were paid during 2015."[172] The Trustee corroborated Ms. Hughes testimony and offered into evidence at least fifteen claim approval notices received on March 27, 2015, from Care Improvement Plus approving payment for claims based on services performed by Texas RHH between December 17, 2010, and October 7, 2012.[173] Additionally, Ms. Brady confirmed that her review of the available documents produced by the Defendants revealed that Maxus had received payments in 2015 that were proceeds of Texas RHH's accounts receivable. The Trustee, however, did not offer additional evidence to suggest that such payments collected by Maxus exceeded the approximately $75,000 referenced by Ms. Hughes.

After careful review of the entire evidentiary record, Court finds and concludes that the credible and uncontroverted evidence established that Maxus collected approximately $75,000 of Texas RHH accounts receivable in 2015 but failed to remit such proceeds to Texas RHH as required by the APA.

---

[171] Adv. ECF No. 392, pg. 73, lines 3–5.
[172] Adv. ECF No. 392, pg. 74, line 5 through pg. 75, line 21 and pg. 106, lines 6–15.
[173] Trustee Exs. 150 and 266; *see also* ECF No. 355, pg. 121, line 24 through pg. 130, line 2.

3. ***Defendants' applicable affirmative defenses***

Because the credible evidence established that Maxus failed to remit approximately $75,000 to Texas RHH as required by the APA, the Court must now address each of the Defendants asserted affirmative defenses to Count Three. The Court will address each of the Defendants' asserted affirmative defenses, in turn.

*a. Res Judicata*

The doctrine of res judicata provides that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."[174] "The elements of res judicata are: '(1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties; and (3) a second action based on the same claims that were raised or could have been raised in the first action.'"[175] "In Texas, '[r]es judicata or claim preclusion prevents the relitigation of a claim or cause of action that has been finally adjudicated, as well as related matters that, with the use of diligence, should have been litigated in the prior suit.'"[176]

The Defendants contend that the Trustee's Count Three claims are barred by res judicata."[177] Defendants argue that Texas RHH's decision "to 'drop' those claims *after* a six-week trial in the State Court does not matter. The relevant inquiry is whether the claims at issue were raised or could have been raised."[178] Defendants contend further that Texas RHH's Count Three

---

[174] *Allen v. McCurry*, 449 U.S. 90, 94 (1980); *Barr v. Resolution Trust Corp. ex rel. Sunbelt Fed. Sav.*, 837 S.W.2d 627, 629 (Tex. 1992).

[175] *Eagle Oil & Gas Co. v. TRO-X, L.P.*, 519 S.W.3d 699, 705–06 (Tex. 2021) (quoting *Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 449 (Tex. 2007)); *see also In re Ice Melt Products*, 344 B.R. 810, 814 (Bankr. N.D. Tex. 2006).

[176] *U.S. ex rel. Laird v. Lockheed Martin Eng'g and Sci. Servs. Co.*, 336 F.3d 346, 357 (5th Cir. 2003) (quoting *Barr*, 837 S.W.2d at 628).

[177] Adv. ECF No. 306, pgs. 18–20.

[178] Adv. ECF No. 400, pg. 3 ¶ 5.

claim is "an exact replica of the conversion claim that Texas RHH asserted in the State Court Lawsuit . . . ."[179]

The Trustee, on the other hand, contends that, even if Defendants could satisfy the requirements of res judicata, "the policies favoring preclusion of a second action are overcome for an extraordinary reason."[180] The Fifth Circuit Court of Appeals "has recognized that '[p]rinciples of res judicata are not ironclad,' but must be applied to accomplish justice in the light of public policy."[181] Texas law also recognizes that a res judicata affirmative defense may be overcome by extraordinary reasons.[182] Such extraordinary reasons include fraud, concealment, or misrepresentation where the conduct prevents a party from obtaining a full and fair adjudication in the prior action.[183]

Based on the Defendants clear discovery abuses detailed in the Sanction Orders and Mid-Trial Sanction Order, as well as a reasonable inference that Maxus committed similar discovery abuses in the State Court Lawsuit which adversely affected the Debtors' ability to prosecute their Count Three claims in the State Court Lawsuit, the Court finds and concludes that the extraordinary reason justification applies to overcome the Defendants' res judicata affirmative defense. Consequently, the Defendants' res judicata affirmative defense to Count Three is ***OVERRULED*** and ***DENIED***.

---

[179] Adv. ECF No. 400, pg. 39 ¶ 78.

[180] Adv. ECF No. 401, pg. 22.

[181] *Jackson v. Johns-Manville Sales Corp.*, 727 F.2d 506, 521 (5th Cir. 1984); Adv. ECF No. 401, pg. 23 ¶ 40.

[182] Restatement (Second) of Judgments § 26 ("***Restatement***"); Adv. ECF No. 401, pgs. 22–23 ¶¶ 39–41; *see also* Adv. ECF No. 111, pg. 5.

[183] Restatement § 26(1)(f).

### b.  Capacity

Mr. Hammond contends that to the extent the Trustee seeks a judgment against him for claims asserted in Count Three, he was not a party to the APA and cannot be held liable for breach of the APA.[184] The Court agrees. Consequently, to the extent the Trustee seeks a judgment against Mr. Hammond for claims asserted in Count Three, the Court **SUSTAINS** Mr. Hammond's affirmative defense of Capacity.

### c.  Offset

Offset (or setoff) "allows entities that owe each other money to apply their mutual debts against each other." In the bankruptcy context, the Bankruptcy Code "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case . . . ."[185] To establish a right of setoff, the Defendants must establish (i) "A debt exists from the creditor to the debtor and that debt arose prior to the commencement of the bankruptcy case"; (ii) "The creditor has a claim against the debtor which arose prior to the commencement of the bankruptcy case"; and (iii) "The debt and the claim are mutual obligations."[186] Mutuality requires that "each party must own his claim in his own right severally, with the right to collect in his own name against the debtor in his own right and severally."[187]

The Defendants contend that Maxus has a multi-million-dollar judgment against Texas RHH which is eligible to be offset against the potential liquidated claim from Count Three.[188] The

---

[184] Adv. ECF No. 306, pg. 19.

[185] 11 U.S.C. § 553(a).

[186] *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1035 (5th Cir. 1987) (quoting *In re Nickerson & Nickerson, Inc.*, 62 B.R. 83, 85 (Bankr. D. Neb. 1986)).

[187] *Braniff Airways, Inc.*, 814 F.2d at 1036 (quoting *In re V.N. DePrizio Const. Co.*, 52 B.R. 283, 287 (Bankr. N.D. Ill. 1985)).

[188] Adv. ECF No. 306, pg. 20.

Court agrees. Consequently, the Court **SUSTAINS** Maxus' affirmative defense of offset as it relates to the $75,000 liquidated claim established by the Trustee against Maxus in Count Three.

> *d.   Other affirmative defenses to Count Three*

Because the Court has sustained (i) Mr. Hammond's affirmative defense of capacity, and (ii) Maxus' affirmative defense of offset to the Trustee's Count Three claims, the Court need not analyze and address the Defendants' remaining affirmative defenses to Count Three. Consequently, the Defendants' other affirmative defenses to Count Three are moot.

**4.   *Conclusions regarding Trustee's Count Three***

The Court finds and concludes that the credible and uncontroverted evidence established that Maxus collected approximately $75,000 of Texas RHH accounts receivable in 2015 but failed to remit such proceeds to Texas RHH, as required by the APA.

Consequently, the Trustee's claims in Count Three against Maxus are **GRANTED** in the total liquidated amount of **$75,000**. But Maxus' affirmative defense of offset is **SUSTAINED**.

Additionally, Mr. Hammond's affirmative defense of capacity is **SUSTAINED**; consequently, the Trustee's claims in Count Three against Mr. Hammond are **DENIED**.

**F.   Count Four—Attorneys' Fees and Exemplary Damages**

Based on the Court's findings and fact and conclusions of law for Counts One through Three, the claims in Trustee's Count Four are **DENIED**.

**IV.   CONCLUSION**

For the forgoing reasons, the Court finds, concludes as follows:

1.   ***Count One—**Tortious Interference with Contract* is **DENIED**;

2.   ***Count Two—**Turnover of Debtors' Records/Value of Accounts Receivable*, as modified, is **DENIED**;

48

3.  ***Count Three—****Turnover of Accounts Receivable Proceeds* against Maxus is ***GRANTED*** in the liquidated amount of ***$75,000*** but Maxus' affirmative defense of Offset is ***SUSTAINED***;

4.  ***Count Three—****Turnover of Accounts Receivable Proceeds* against Mr. Hammond is ***DENIED***; and

5.  ***Count Four—****Attorneys' Fees and Exemplary Damages* is ***DENIED***.

The Court will enter a separate Judgment consistent with this Memorandum Opinion following the liquidation of the Trustee's and Debtors' reasonable costs and attorneys' fees awarded in the Sanction Orders and Mid-Trial Sanction Order.

### # # # END OF MEMORANDUM OPINION # # #